# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **HASAN BAYADI,** | ) | Civil Action No. 7:15cv00618 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **HAROLD CLARKE**, *et al.*, | ) | By: Norman K. Moon |
| Defendants. | ) | United States District Judge |

Hasan Bayadi, a Virginia inmate proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 1983 naming three staff of the Virginia Department of Corrections ("VDOC") and Wallens Ridge State Prison ("Wallens Ridge") as defendants in both their individual and official capacities. Bayadi contends that the VDOC's grooming policy, Operating Procedure ("OP") 864.1, violates the First and Fourteenth Amendments of the Constitution; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.*; Article 1, Section 16 of the Virginia Constitution, and Virginia Code § 8.01-42.1. Bayadi seeks declaratory relief, damages, and a permanent injunction. Defendants filed a second motion for summary judgment, and Bayadi responded, making this matter ripe for disposition.[1] Having considered the record, I conclude that defendants' second motion for summary judgment must be denied as to the RLUIPA claim, but granted as to each of the other claims.

## I.

Bayadi arrived at Wallens Ridge on September 1, 2015, and shortly thereafter, he shaved his beard. Bayadi was housed in general population when he commenced this action in November 2015.

---

[1] I previously granted in part defendants' first motion for summary judgment as to claims for damages against defendants in their official capacities and denied it in part as to their exhaustion arguments under 42 U.S.C. § 1997e(a).

Bayadi explains that he wants to grow his beard to an indeterminate length in conformity with his religious beliefs. Bayadi contends that he feels compelled to shave his beard per OP 864.1 in violation of his religious beliefs because, if he does not, he thinks he will be placed in segregated housing until the earlier of 1) cutting his beard, and thus violating a religious belief, or 2) a year's confinement in punitive segregation, at which time he transfers to the "grooming general-population pod" where he is not allowed to attend a weekly Islamic congregational service, Jummah.[2] Bayadi alleges that no recognized inmate religious groups but Muslims are forced to choose between violating religious beliefs by cutting a beard or violating religious beliefs by forfeiting a weekly congregational service.

OP 864.1 establishes uniform personal grooming standards for male inmates in the VDOC. Beards of one-quarter inch maximum length are permitted in order to accommodate religious, medical, and secular reasons without the need for prior approval.[3] Longer beards are prohibited, according to VDOC, because they could conceal contraband; create a health, hygiene, or sanitation hazard; or significantly compromise the ability to identify an offender. Prison officials explain that the length limitation promotes institutional security, sanitation and allows prison officials to identify markings, such as scars and tattoos, that would be hidden under beards of indeterminate length. The length limitation gives officials more control over the concealment of contraband that can be used as weapons. Prison officials also explain that prison hygiene can be compromised with indeterminate length beards because infestations and medical

---

[2]  The defendants' policies have changed since the complaint was filed, and so Bayadi no longer would be placed into a year of segregation before moving to the Grooming Standards Violator Housing Unit.

[3]  Although prior approval is not needed, the inmate must notify a unit manager so that updated identification photos show the inmate with and without facial hair.

complications from ringworms, lice, and other insects are more likely to occur and may be undetected under beards of indeterminate length.

Inmates who violate the beard policy may be charged with Disciplinary Offense Code 133, "Refusal to Obey an Order." OP 864.1 allowed inmates who refuse to shave their beards to transfer to a special general population housing unit known as the Grooming Standards Violator Housing Unit ("VHU"). This policy has changed over time. When Bayadi arrived at Wallens Ridge on September 1, 2015, an inmate should have met the following criteria before moving to the VHU: an institutional conviction of Refusing to Obey an Order; completed the VDOC's Challenge Series workbooks while in restrictive housing for six months; six months' free of more serious charges; and three months' free of less serious charges. The Warden of Wallens Ridge could allow an inmate to move into the VHU without having met all of the criteria. On August 1, 2016, OP 864.1 was amended to remove the six-month restrictive housing requirement, and thus, the eligibility criteria for the VHU are merely a "Refusal to Obey an Order" conviction and no history of disruptive or assaultive behavior.

However, even after August 1, 2016, the VHU consists of two phases in two pods. VHU inmates are first assigned to Phase I, which has "fewer incentives" than Phase II. Phase I inmates are housed alone in a single cell, have only one hour of in-pod recreation daily; have only one hour of outside exercise five times per week; have a commissary limit of $10.00 per week for consumable and hygiene items; and do not participate in the SecurePak Program.[4] Phase I inmates must comply with all mandated programming and cell regulations for six months before graduating to Phase II, and that programming is dependent on the inmate's Risk/Needs

---

[4] SecurePak refers to a program allowing people to send to a VDOC inmate a custom package of food and merchandise from an online inventory of commissary items.

Assessment and may include the VDOC's Challenge Series workbooks. Phase II inmates are housed with a cellmate; enjoy five hours of out-of-cell activity daily; enjoy one hour of outside recreation daily; have access to gymnasium recreation; have a commissary limit of $50.00 per week for consumable and hygiene items; and may participate in the SecurePak Program. Regardless of the phase, all inmates in the VHU receive meals in the pod; consume meals in their cells; may have jobs; and have access to the chaplain, television programming, approved religious and educational programming, approved individual faith objects, two hours of non-contact visitation weekly, and re-entry services. Notably, Phase I inmates are not allowed to participate in scheduled group religious services, but Phase II inmates are. This means that an inmate would not be able to attend Jummah, or other group services, for six months after he began to grow a beard longer than a quarter-inch.

The VDOC centralizes the housing of inmates in the VHU for inmates who violate OP 864.1 because beards of indeterminate length pose a security risk and health hazard, and thus, chronic violators are more easily managed in a single facility. For example, the VHU reduces potential staffing and training costs that would be incurred to monitor indeterminate length beards throughout all VDOC facilities by instead containing those beards in two pods in one prison. Furthermore, the VHU mitigates security and sanitation complications that would occur if indeterminate length beards were allowed throughout all VDOC facilities.

Bayadi claims that this policy, OP 864.1, violates RLUIPA, the First and Fourteenth Amendments, the Virginia Constitution, and a Virginia law prohibiting religious harassment. He claims that defendants' reasons for not allowing beards of indeterminate length are "false and without merit" because he feels the VHU proves that indeterminate length beards do not pose a security threat or hygiene problem. Bayadi claims that because prison officials have crafted a

workable solution on a small scale, the solution can be expanded and beards of indeterminate length can be grown in any pod in any VDOC facility. Bayadi also claims that long-bearded inmates do not pose a security threat because officers can search beards "as easily as they can search an inmate's pockets." Bayadi claims that no hygiene problems would result from allowing beards of indeterminate length because each of VDOC's commissaries sells numerous hair care products. Lastly, Bayadi claims that long hair and beards actually "enhance" officials' ability to identify inmates because inmates who grow beards have to get updated photographs.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). If, however, the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). A plaintiff may not amend a complaint through argument in a brief opposing summary judgment. *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).

**III.**

Defendants claim that they are entitled to qualified immunity from damages. Qualified immunity is "an immunity from suit rather than a mere defense to liability," and it is therefore "effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Indeed, the "driving force" behind the doctrine is the "desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Id.* (alteration in original). Even when a plaintiff's constitutional rights have been violated, qualified immunity applies to bar the claim if, based on the facts presented, "a reasonable officer could have believed [his actions] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *see In re Allen*, 106 F.3d 582, 593 (4th Cir. 1997) ("[A]n official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority.").

Bayadi does not identify a personal act or omission by defendants Harold Clarke, who is the Director of the VDOC, or Leslie Fleming, who is the Warden of Wallens Ridge.[5] Accordingly, Clarke and Fleming are entitled to qualified immunity and summary judgment in their individual capacities about OP 864.1's prohibition of beards of indeterminate length in all facilities.

**IV.**

Defendants are entitled to summary judgment as to damages sought under RLUIPA. RLUIPA does not authorize damages against a public official under the Spending Clause of the

---

[5] The relevant conduct by defendant David Robinson, who is the Chief of Corrections of the VDOC, was signing OP 864.1, which includes the prohibition of group religious services for Phase I inmates in the VHU.

6

United States Constitution.[6]  *See Sossamon v. Texas*, 563 U.S. 277, 282 n.1, 293 (2011) (prohibiting damages claims against state officials in their official capacity under the Spending Clause); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same for individual capacity). Accordingly, Bayadi cannot recover damages against defendants under RLUIPA.

## V.

Defendants are not entitled to summary judgment in their official capacities as to OP 864.1's restriction on indeterminate beard length under RLUIPA, but they are entitled to summary judgment in their official capacities on the First and Fourteenth Amendment claims.

### A.

RLUIPA prohibits government officials from imposing a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.[7] 42 U.S.C. § 2000cc-1(a). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use

---

[6]  I consider the RLUIPA claim only pursuant to the Spending Clause because Bayadi does not contend that RLUIPA applies under the Constitution's Commerce Clause. *See, e.g.*, *Washington v. Gonyea*, 731 F.3d 143, 146 (2d Cir. 2013) (declining to consider "whether RLUIPA authorizes individual-capacity suits under the imprimatur of the commerce clause" where plaintiff "pled no facts" pertaining to interstate commerce); *compare* 42 U.S.C. § 2000cc-1(b)(1) (Spending Clause provision), *with id.* § 2000cc-1(b)(2) (Commerce Clause provision).

[7]  "Government" includes the defendants, who work for the VDOC. 42 U.S.C. § 2000cc-5(4)(A).

it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015); *see also*, *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015).[8]

The RLUIPA analysis here tracks *Holt v. Hobbs*, 135 S. Ct. 853 (2015). In that remarkably similar case, a devout Muslim inmate wished to grow a half-inch beard. *Id.* at 859. But the Arkansas Department of Correction's grooming policy "prohibited[ed] inmates from growing beards unless they have a particular dermatological condition." *Id.* The Supreme Court held that this policy violated RLUIPA because "the Department has failed to show that its policy is the least restrictive means of furthering its compelling interests." *Id.* While O.P. 864.1 is different than Arkansas's policy, it suffers from similar problems and so I will deny defendants' motion for summary judgment on the RLUIPA claim.[9]

Bayadi "bore the initial burden of proving that the Department's grooming policy implicates his religious exercise." *Holt*, 135 S. Ct. at 862. In *Holt*, the Court identified the religious exercise as the inmate's "growing of a half–inch beard." *Id.* Here too, Bayadi desires to exercise his religion through the growing of his beard. (Dkt. 26 at 2). Defendants' motion for summary judgment does not appear to question that this practice is both sincerely held and

---

[8] Defendants observe that an unpublished opinion from this Court previously upheld the policy. *See Coleman v. Jabe*, No. 7:11-cv-518, 2014 WL 2040097, at *2 (W.D. Va. May 16, 2014) (Wilson, J.). This opinion was published before *Holt*. This Court later denied a motion for reconsideration in that case after *Holt*. *Coleman v. Jabe*, No. 7:11-cv-00518, 2015 WL 13346851, at *1 (W.D. Va. June 5, 2015) (Urbanski, J.). The order denying the motion for reconsideration addressed whether *Holt* modified its ruling on the beard length claim in one sentence and in a footnote. I respectfully disagree with its analysis. As the following analysis demonstrates, *Holt* provides significant guidance on how to evaluate whether OP 864.1 is the least restrictive means of further the government's interests.

[9] The Arkansas policy prevented all beards, while OP 864.1 only prevents beards longer than a quarter-inch and then allows longer beards in the VHU.

rooted in religious belief.  *See* 42 U.S.C. § 2000cc-5(7) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief").

In addition to showing that the grooming policy implicates his religious belief, Bayadi "also bore the burden of proving that the Department's grooming policy *substantially burdened* that exercise of religion." *Holt*, 135 S. Ct. at 862 (emphasis added).  In *Holt*, the Court held that the religious exercise was substantially burdened because "[i]f petitioner contravenes [the] policy and grows his beard, he will face serious disciplinary action." *Id.*  Forcing this choice on an inmate "substantially burdens his religious exercise." *Id.*  Here, if Bayadi contravenes the quarter–inch policy, he will be given an order to comply, charged with an offense for "Refusal to obey an order to comply with the Department's grooming standard," placed in Detention, and moved to the VHU. (Dkt. 24-1 at 14).  Once in the VHU, the Plaintiff will be "orientated" into "phase I" of Violator Housing Unit where he must live by himself, face severe limitations on time outside the cell, and "will not participate in group [religious] services" for six months. (*Id.* at 16).  After that six month period, all of these restrictions are loosened. (*Id.*).  Six months of this restrictive housing status and an inability to "participate in group [religious] services" qualify both as "serious disciplinary action" and a substantial burden. (Dkt. 26 at 2).

"Since petitioner met his burden of showing that the Department's grooming policy substantially burdened his exercise of religion, the burden shift[s] to the Department to show that its refusal to allow" grow a beard longer than a quarter-inch "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." *Holt*, 135 S. Ct. at 863 (quoting 42 U.S.C. § 2000cc–1(a)) (internal quotations omitted).  Both in *Holt* and in the instant case, the Departments argued that their grooming policies were in furtherance of governmental interests in "the identification of

9

offenders and to promote safety, security, and sanitation." (Dkt. 24-1 at 11). In *Holt*, the Court "[did] not question the importance of the Department's interests in stopping the flow of contraband and facilitating prisoner identification." *Holt*, 135 S. Ct. at 859. Likewise, I do not doubt that the government's interests here are compelling.

However, I agree with *Holt* and "conclude that the Department has failed to show that its policy is the least restrictive means of furthering its compelling interests." *Id.* Defendants state that OP 864.1 is the least restrictive means of furthering its compelling interests in identification of inmates, prevention of contraband, and maintaining prisoner hygiene. (Dkt. 24 at 3-4, 9-10). In particular, defendants argue that the special accommodation of the VHU is the least restrictive means of furthering its compelling interest. (*Id.* at 10). This argument fails for two overarching reasons.

First, OP 864.1's general requirement of a quarter-inch beard is not the least restrictive means of furthering the Department's interests. In *Holt*, the Court balked at the notion that an inmate would be able to hide contraband in a half-inch beard. 135 S. Ct. at 863. ("We readily agree that the Department has a compelling interest in staunching the flow of contraband into and within its facilities, but the argument that this interest would be seriously compromised by allowing an inmate to grow a half–inch beard is hard to take seriously."). OP 864.1's suggestion that a quarter-inch beard would seriously compromise the Department's interest in hiding contraband is likewise dubious. The quarter-inch requirement also seems obviously underinclusive—inmates are able to grow hair on top of their head to one inch. (Dkt. 24-1 at 12). "Since the Department does not demand that inmates have shaved heads or short crew cuts, it is hard to see why an inmate would seek to hide contraband in a half–inch beard rather than in the longer hair on his head." *Holt*, 135 S. Ct. at 863. This is equally true for a quarter-inch

10

beard. Finally, "[t]he Department failed to establish that it could not satisfy its security concerns by simply searching petitioner's beard." *Id.* at 864. This is actually the alternative suggested by Bayadi. (Dkt. 1 ¶ 12). Defendants have not demonstrated why a quarter-inch beard limit is necessary to further its interest in preventing contraband.

*Holt* was unpersuaded that a half-inch beard limit was the least restrictive means of furthering the government's interest in identification when the defendants could not show "why [identification] problems could not be addressed by taking a photograph of an inmate without a beard, a practice followed in other prison systems." *Id.* at 861. The defendants here actually follow this practice of taking pictures of inmates with and without a beard. They have not addressed why this practice does not remedy their identification concerns. *Holt* was skeptical that there were any differences in the government's identification interests between prisoners with quarter-inch and prisoners with half-inch beards. 135 S. Ct. at 865. Although this policy must be analyzed within its unique context, the defendants have not sufficiently explained why a quarter-inch beard limit is the least restrictive means of furthering this interest.

Similarly, the defendants have not attempted to demonstrate that the quarter-inch requirement is necessary to further the government's compelling interest in inmate hygiene. Instead, defendants rely on an affidavit that states generally that "[t]he longer an offender's beard is allowed to grow, the more likely conditions such as ringworm of the beard, beard dandruff, follicultis, and lice are to occur." (Dkt. 24 at 4). This may be true, but defendants do not demonstrate why the quarter-inch length, as opposed to the half-inch length (as in *Holt*) or the whole inch length (as on inmates' heads), is the least restrictive means. Furthermore, defendants have not demonstrated why Bayadi's suggestion of using the soap and shampoo available for other hair care would be insufficient. And again, it is the defendants' burden to demonstrate that

11

their policy is the least restrictive means of furthering their compelling interests. *Holt*, 135 S. Ct. at 859.[10]

Second, defendants argue that the VHU alleviates these concerns, but they fail to demonstrate that it is the least restrictive means of furthering the Department's interests. Inmates who want to continue growing beards beyond a quarter-inch must be given an order to comply with the policy, charged with an offense for refusing to obey, placed in Detention, and then moved to phase I of the VHU (where they have restrictive housing options and cannot participate in group religious services for six months). (Dkt. 24-1 at 14-16). Defendants must prove that this is the least restrictive means of furthering their compelling interests. They have not.

Most problematically, phase I of the VHU prevents inmates from participating in group religious services. (Dkt. 24-1 at 16). After the end of six months in phase I, inmates move to phase II of the VHU where they are allowed to attend group religious services. (*Id.*). It is difficult to see how many aspects of this policy, and specifically this limit on group religious service participation, could be the least restrictive means necessary to further the government's compelling interests or how they further the compelling interests at all.[11] What is it about these phase I inmates (whose beards are presumably the same length as the phase II inmates) that requires these restrictions in order to protect the defendants' interests in identification, hygiene,

---

[10] Additionally, and as is relevant to all three of the interests just discussed, "the Department failed to show, in the face of petitioner's evidence, why the vast majority of States and the Federal Government permit inmates to grow half–inch beards, either for any reason or for religious reasons, but it cannot." *Holt*, 135 S. Ct. at 866.

[11] This is not to say that the six month limitation on religious services is the only concerning part of the policy. It is similarly difficult to see what compelling interest is furthered by the other restrictions that are put on phase I inmates, and even more difficult to see that these restrictions are the least restrictive means of pursuing the government's interests.

and finding contraband? Ultimately, this is the defendants' question to answer, and they have not done so.

Defendants defend OP 864.1 by arguing that bearded inmates are "easier managed" in the VHU and that the policy "reduces potential staffing and training costs." (Dkt. 24 at 10). These justifications miss the mark because they are not compelling interests. RLUIPA was enacted "in order to provide very broad protection for religious liberty." *Holt*, 135 S. Ct. at 859 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)). That protection is not necessarily abrogated when alternatives would be cheaper or easier for the government—the defendants must truly seek the least restrictive means.

This, of course, is not to say that an inmate can run the prison—or that defendants must grant Bayadi's request to allow long beards throughout the prison. A system very like the VHU may in fact be the least restrictive means of furthering the government's compelling interests—but the government has not demonstrated why the various seemingly-punitive aspects of phase I of the VHU are the least restrictive means of furthering its interests.

Finally, defendants argue for "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations . . . ." (Dkt. 24 at 7-8 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005))). *Holt* did not abrogate this language from *Cutter*—I still must give prison and jail administrators due deference—but *Holt* is clear that this deference "does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." *Holt*, 135 S. Ct. at 864. "And without a degree of deference that is tantamount to unquestioning acceptance, it is hard to swallow the argument that denying petitioner a half–inch beard actually furthers the Department's interest in rooting out contraband." *Id.* Similarly, it would take an incredible amount of deference to hold that OP

13

864.1 is the least restrictive means of furthering these interests without any demonstration that the various provisions of OP 864.1 (for example, the prohibition on group worship) are the least restrictive ways of achieving those goals.

In sum, *Holt* mandates that defendants' motion for summary judgment on the RLUIPA claim fails because they have not demonstrated that OP 864.1 is the least restrictive means to further their compelling interests.

**B.**

Bayadi also claims his First Amendment rights were violated. While RLUIPA affords heightened protection to a prisoner's religious exercise, the First Amendment is more deferential to prison official's decisions impacting religious exercise. An inmate's right to religious exercise must be balanced with a prison's institutional needs of security, discipline, and general administration. *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987).

In contrast to RLUIPA's strict scrutiny, a correctional regulation or management decision that substantially burdens an inmate's First Amendment right is valid if it is reasonably related to legitimate penological interests. *Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006). Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right … remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

*Id.* at 200 (citing *Turner v. Safley*, 482 U.S. 78, 89-92 (1987)); s*ee Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (recognizing the prisoner has the burden to disprove the validity of a prison regulation pursuant to the *Turner* analysis). A "substantial burden" on religious exercise occurs under the First Amendment if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *Lovelace*, 472 F.3d at 187; *see, e.g.*, *Patel v. Bureau of Prisons*, 515 F.3d 807, 814 (8th Cir. 2008) ("When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA, and RLUIPA.").

Bayadi's allegations satisfy the questions of sincere religious need for the First Amendment.[12] Nonetheless, Bayadi does not establish a violation of the First Amendment about restrictions involving beards of indeterminate length. *See, e.g.*, *Overton*, 539 U.S. at 132 (discussing a plaintiff's burden to disprove the reasonableness of the regulation under the *Turner* factors). Bayadi does not show that it is unreasonable for the VDOC to prohibit inmates from growing beards of indeterminate length while housed in general population. There is a "valid, rational connection" between regulating beard length and defendants' explanations about security and sanitation. *See Lovelace*, 472 F.3d at 182, 190 (stating "emphatically that any substantive explanation offered by the prison must be viewed with due deference"). As in the RLIUPA discussion, the government has legitimate penological interests in identification of inmates, preventing the spread of contraband, and inmate hygiene. There is a rational connection

---

[12] I note that the *Turner* factors apply to the First Amendment claim only, not the RLUIPA claim.

between OP 864.1's beard length restrictions and these interests. Because the initial length restrictions are valid, the VHU restrictions are rationally related to VDOC's penological interest in having inmates obey valid orders. Unlike the RLUIPA claim, here it is Bayadi's burden to disprove the reasonableness of these regulations—and he has not done so.

Accordingly, defendants' motion for summary judgment will be granted as to the First Amendment claim about OP 864.1 and indeterminate beard length.

## C.

Defendants are entitled to summary judgment on the construed equal protection claim about indeterminate length beards arising under the Fourteenth Amendment. The Equal Protection Clause requires that persons similarly situated be treated alike. *Plyer v. Doe*, 457 U.S. 202, 216 (1982). To state such a claim, a plaintiff must demonstrate that he has been treated differently from others who are similarly situated and that the unequal treatment was the result of intentional discrimination. *Morrisson v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If the plaintiff does not make this threshold showing, a court need not determine whether the alleged disparate treatment was justified under the appropriate level of scrutiny. *Ephraim v. Angelone*, 313 F. Supp. 2d 569, 573-74 (E.D. Va. 2003); *see also Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995) (stating that a plaintiff must show more than the fact that "a benefit was denied to one person while conferred on another" to prove that he was intentionally or purposefully discriminated against).

The verified complaint does not describe how Bayadi is treated differently than any other inmate who wants to grow an indeterminate length beard. The record does not show how OP 864.1 treats any inmate or protected class differently for beard lengths. Accordingly, defendants are entitled to summary judgment for the equal protection claim about beard length.

## VI.
### A.

Bayadi claims that defendants have violated his religious rights afforded by Article 1, Section 16 of the Virginia Constitution.[13]  The Supreme Court of Virginia has explained that provisions of the Virginia Constitution do not provide an independent basis for a private right of action unless they are self-executing.  *See, e.g.*, *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681 (1985).  Bayadi does not argue that Article 1, Section 16 of the Virginia Constitution has been held to be self-executing.  Furthermore, his assertion of this state-law claim relies on labels and conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (noting labels and conclusions are not sufficient to state a claim).  Accordingly, this state law claim will be dismissed without prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

---

[13]   This section reads:
> That religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other. No man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened [sic] in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities. And the General Assembly shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this Commonwealth, to levy on themselves or others, any tax for the erection or repair of any house of public worship, or for the support of any church or ministry; but it shall be left free to every person to select his religious instructor, and to make for his support such private contract as he shall please.

**B.**

Bayadi claims that defendants have violated Virginia Code § 8.01-42.1 which provides a right of action for victims of intimidation, harassment, violence, or vandalism, when such acts are motivated by racial, religious, or ethnic animosity. Bayadi does not provide any factual support to the claim that he is a victim of intimidation, harassment, violence, or vandalism that was motivated by religious animosity. *See, e.g.*, *Christian v. Virginia*, Civil Action No. 3:14-CV-417, 2014 U.S. Dist. LEXIS 88197, at *7 (E.D. Va. June 27, 2014) (dismissing the plaintiff's claim under Virginia Code § 8.01-42.1 because plaintiff had "not alleged any facts suggesting intimidation, harassment, violence, or vandalism motivated by religious, ethnic, or racial animus"). Accordingly, defendants are entitled to summary judgment for this claim.

**VIII.**

For the reasons stated, I will dismiss the claim based on the Virginia Constitution without prejudice pursuant to 28 U.S.C. § 1915A(b)(1), will deny defendants' motion for summary judgment as to the RLUIPA claim, and will grant defendants' motion for summary judgment to all the other claims.

**ENTER**: This 25th day of September, 2017.

*/s/ Norman K. Moon*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE